IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal No. |
| | ) | |
| v. | ) | **Count One**: 18 U.S.C. § 371 |
| | ) | (Conspiracy) |
| | ) | **Count Two**: 18 U.S.C. |
| ROBERT J. STEIN, JR., | ) | § 201 (Bribery) |
| | ) | **Count Three**: 18 U.S.C. |
| Defendant. | ) | § 1956(h) (Money Laundering |
| | ) | Conspiracy) |
| | ) | **Count Four**: 18 U.S.C. § |
| | ) | 922(g)(1)(Felon in Possession |
| | ) | of Firearm) |
| | ) | **Count Five**: 18 U.S.C. §§ |
| | ) | 922(o)(Possession of a Machine |
| | ) | Gun) and 2 (Aiding, Abetting, |
| | ) | and Causing) |

## INFORMATION

The United States charges:

## COUNT ONE
## 18 U.S.C. § 371
## (Conspiracy)

At all relevant times:

1.    From in or about December 2003 until in or about
December 2004, Defendant

**Robert J. STEIN, Jr.** (**"STEIN"**)

and others did knowingly and unlawfully conspire with others
known and unknown to violate statutes of the United States,
namely 18 U.S.C. § 201 (bribery), 18 U.S.C. § 1343 (wire fraud),
18 U.S.C. § 1346 (honest services fraud), and 18 U.S.C. § 2314
(interstate transportation of stolen property), by, among other

things, accepting money and other items of value in exchange for steering contracts to a government contractor in Al-Hillah, Iraq through a rigged bidding process and by stealing U.S. currency designated to be used for the reconstruction of Iraq.

## BACKGROUND

2.   On May 8, 2003, the United States and the United Kingdom presented a joint letter to the United Nations stating that they "and Coalition partners, acting under existing command and control arrangements through the Commander of Coalition Forces, have created the Coalition Provisional Authority (CPA), which includes the Office of Reconstruction and Humanitarian Assistance (ORHA), to exercise powers of government temporarily, and, as necessary, especially to provide security, to allow the delivery of humanitarian aid, and to eliminate weapons of mass destruction."   The President of the United States appointed a United States Ambassador to serve as the Administrator of the CPA and thus the civil governing authority of Iraq but who remained subject to the President.

3.   In 2003, Congress appropriated $698 million in initial funding to the CPA for its daily operating budget as part of the Emergency Wartime Supplemental Appropriations Act.   Thereafter, the CPA conducted its operations and awarded contracts for projects intended to promote Iraq's reconstruction from several funding sources, including over $24.1 billion in funds

2

appropriated in 2003-2004 by Congress from the General Funds of the United States as well as $2.1 billion in repatriated Iraqi funds that were confiscated by the United States during the Gulf War in 1990. The United States deposited $210 million of the repatriated funds into a CPA account known as the Development Fund for Iraq (DFI) which in addition to the United States' deposits, also included Iraqi funds derived from oil sales.

4.    The CPA was primarily staffed by Department of Defense (DOD) employees, including civilians and members of the military forces detailed to the CPA ("DOD employees"), as well as DOD contractors and subcontractors, who were responsible for the management, accounting, and expenditure of all of the aforementioned funds.

5.    In order to enter into contracts for the rebuilding of Iraq, the CPA used DOD contracting forms and procedures as well as creating CPA-specific contracting forms and procedures. The CPA promulgated its procedures in the CPA Contracting Memorandum which referenced and incorporated the competition, transparency and accountability standards applicable to federally-funded DOD contracts. As examples, the CPA utilized CPA Form 44 to authorize small payments (called "micropurchases") on CPA contracts for less than $15,000, and it established monetary limits on the contracts that could be approved by certain officials.

6.    CPA contracting rules prohibited the use of appropriated or DFI funds to purchase weapons.

7.    Defendant **STEIN** was a DOD contract employee, who served in various positions at the CPA-South Central Region (CPA-SC) including Comptroller and funding officer and was assigned to the United States Embassy in Al-Hillah, Iraq.  In his official capacity, Defendant **STEIN** controlled the expenditure of over $82 million dollars in funds, including appropriated and DFI funds that were to be used for the payment of contract services rendered in Al-Hillah, Iraq for the rebuilding of Iraq.  Prior to working for the CPA, in July 1996, Defendant **STEIN** had been convicted of access device fraud, in violation of 18 U.S.C. § 1029, in the U.S. District Court for the Eastern District of North Carolina.

8.    Co-conspirator One is an officer in the United States Army Reserve, a DOD component.  During times relevant to this Information, Co-conspirator One served as the Chief of Staff for the CPA-SC, and was responsible for supervising the CPA personnel who award contracts related to the reconstruction of Iraq and made payments for the CPA-SC in Al Hillah, Iraq, including Defendant **STEIN**.

9.    Co-conspirators Two, Three, Four and Five are officers in the United States Army Reserve.  During relevant times, each served under the direct supervision of Co-conspirator One at the

4

CPA-SC in Al-Hillah, Iraq.  Co-conspirator Two and Three's duties included serving as advisors and project officers on projects for the reconstruction of Iraq which involved recommending the expenditure of CPA funds for those projects.  Co-conspirator Four's duties included serving as the Deputy Comptroller to Defendant **STEIN** and, in his absence, she served as the acting Comptroller for the CPA-SC.  Co-conspirator Five was a contract officer responsible for administering contracts entered into between the CPA-SC and private contractors doing business in Iraq.

10.  Co-conspirator Six is a United States citizen who operated and controlled construction and service companies in Iraq and Romania, which did business with the CPA-SC in Al Hillah, Iraq.

11.  During relevant times, Persons A, B and C were public officials working for or with the CPA in the United States' reconstruction efforts in Iraq. Person D owned and operated a financial services business outside the United States.

### THE CONSPIRACY AND ITS OBJECTS

12.  Beginning in or about December 2003 and continuing until in or about December 2004, in Al-Hillah, Iraq and elsewhere, Defendant **STEIN** did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the United States to commit the following offenses against the

5

United States:

      a.    to directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept something of value, that is money and goods from Co-conspirator Six, in return for being influenced in the performance of official acts and for being induced to do or omit to do acts in violation of a lawful duty; that is Defendant **STEIN**, Co-conspirators One, Two, Three, Four and Five, and other public officials agreed to use their official positions to violate CPA and DOD procurement regulations and other laws in order to steer contracts to Co-conspirator Six's companies and arrange for payment on those contracts to Co-conspirator Six, in violation of 18 U.S.C. § 201(b)(2)(A) and (C); and

      b.    to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to deprive the CPA and the DOD of their intangible right to the honest, loyal, and faithful services of Defendant **STEIN** and others by interstate wire transmissions, in violation of 18 U.S.C. §§ 1343 and 1346; and

      c.    to transport, transmit, and transfer in interstate and foreign commerce goods, wares, and money, exceeding more than $5,000 knowing the same to have been stolen, converted and taken by fraud, in violation of 18 U.S.C. § 2314.

## MANNER AND MEANS OF THE CONSPIRACY

It was a part of the conspiracy that Defendant **STEIN** and his coconspirators would among other things, do the following:

13.  Recommend numerous construction projects in Al-Hillah, Iraq, that were intended to be, and would be, steered to Co-conspirator Six and his companies through a rigged bidding process with one "low bid" from a Co-conspirator Six company and several "dummy" bids.

14.  Structure the contracts awarded to Co-conspirator Six in amounts under $500,000, which was the dollar limit of Defendant **STEIN**'s contracting authority, in order to conceal the transactions with Co-conspirator Six and avoid scrutiny by the CPA's auditors in Baghdad, Iraq, and others.  Further, Defendant **STEIN** and others would use their official positions to cause, or authorize, the payment on the fraudulently awarded contracts to Co-conspirator Six and his companies.  In particular, Defendant **STEIN** would authorize payments on CPA Form 44, exceeding without authorization its $15,000 payment ceiling.

15.  Facilitate and conceal Co-conspirator Six's submission of multiple bids on the same CPA contract in the names of different companies which were either non-existent or controlled by Co-conspirator Six.  The bids submitted included both the "low" bid and several "high" bids which enabled Defendant **STEIN** and others to steer over $8,000,000 in contracts to Co-

7

conspirator Six and his companies.

16. Solicit and accept money and other things of value, such as secret employment or potential future employment, business or first class plane tickets, watches and other jewelry, alcohol, cigars, sexual favors from women provided by Co-conspirator Six at his villa in Baghdad, and money laundering services, from Co-conspirator Six in exchange for taking action favorable to Co-conspirator Six, for refraining from taking action that was unfavorable to Co-conspirator Six and his interests, and for unlawfully conveying property to him, including real property and government-owned or acquired personal property such as body armor and other military equipment.

17. Steal U.S. currency including appropriated and DFI funds that were designated to be used for the reconstruction of Iraq. A portion of the stolen currency was smuggled into the United States by Defendant **STEIN** and his Co-conspirators via commercial aircraft. Defendant **STEIN** and others also delivered some of the stolen currency to Co-conspirator Six, who, knowing that the currency was stolen, would deposit it in foreign bank accounts, including accounts under his control in Iraq, Switzerland, Romania and Amsterdam. At least a portion of such funds were then transferred to bank accounts controlled by **STEIN** or his Co-conspirators or Co-conspirator Six would make payments on their behalf to purchase real estate, cars, a motorcycle, a

8

recreational vehicle and jewelry.

## OVERT ACTS

18.   In furtherance of the conspiracy and in order to accomplish its objects, the following overt acts, among others, were committed by one or more of the coconspirators in Al-Hillah, Iraq and elsewhere:

19.   On or about January 1, 2004, Co-conspirator Six sent Defendant **STEIN** an e-mail directing him to get Co-conspirator Two "on board."

20.   On or about January 3, 2004, Defendant **STEIN** sent an e-mail advising Co-conspirator Six that he obtained a contract for him and would give him $200,000 on January 4, 2004.

21.   On or about January 3, 2004, Defendant **STEIN** and Co-conspirator Three caused the award of CPA contract number 8016 in the amount of $491,000, involving building demolition at the Police Academy in Al Hillah, Iraq.

22.   On or about January 7, 2004, Defendant **STEIN** caused the award of CPA contract number 8023 to construct a Regional Tribal Democracy Center in Al-Hillah, Iraq to a company controlled by Co-conspirator Six.

23.   On or about January 7, 2004, Defendant **STEIN** authorized a $200,000 cash payment to Co-conspirator Six on CPA Form 44 for performance on contract number 8023.

24.   On or about January 13, 2004, Defendant **STEIN** provided

9

Co-conspirator Six with his bank account information and the bank's address by e-mail.

25.  On or about January 17, 2004, Defendant **STEIN** sent an e-mail to Co-conspirator Six advising him that he had two contracts to award to him, namely, the generator and the next phase of the police academy, and discussing the wiring of funds.

26.  On or about January 22, 2004, Defendant **STEIN** sent an e-mail to Co-conspirator Six advising him that Co-conspirator Five was ready to award "everything to [Co-conspirator Six] but [Co-conspirator Five] asked [Defendant **STEIN**] if there was anyway [they] could use another name other than" Co-conspirator Six's company?

27.  On or about January 22, 2004, Co-conspirator Six sent a reply e-mail to Defendant **STEIN** advising him that Co-conspirator Six would do work on the Police Academy using two different companies that he owned.

28.  On or about January 26, 2004, Co-conspirator Six sent an e-mail to Co-conspirator Three inquiring as to which of Co-conspirator Six's companies would be assigned a contract.

29.  On or about January 26, 2004, Defendant **STEIN**, signed a DOD Standard Form 1449 contract with a U.S. arms manufacturer based in Sterling, Virginia that provided that the CPA, using appropriated U.S. funds, would purchase the following weapons (the "unauthorized weapons") that were delivered to Fort Bragg,

10

North Carolina, where under the terms of the contract Co-conspirator One would take possession of the weapons:

      a.   four grenade launchers;

      b.   twenty fully automatic submachine guns;

      c.   twelve .308 caliber machine guns;

      d.   twelve .45 caliber pistols; and

      e.   four .45 caliber silencers.

30.  On or about January 27, 2004, Defendant **STEIN** sent an e-mail to Co-conspirator Six advising him to be careful what he said around Person B and stating that "[t]he fewer people who know what we are doing the better."

31. On or about January 27, 2004, Defendant **STEIN** sent an e-mail to Co-conspirator Six thanking him for the "booze," discussing the wire transfer of funds to the United States on Defendant **STEIN**'s behalf, and discussing payments to Co-conspirator Two.

32.  On or about January 29, 2004, Co-conspirator Six sent an e-mail to one of his employees directing that employee to obtain business class tickets for Co-conspirator Two and his spouse, and advising the employee that Co-conspirator Two was very important to Co-conspirator Six's company.

33.  On or about January 31, 2004, Defendant **STEIN** sent an e-mail to Co-conspirator Six advising him that he needed to submit bids for the mobile command post before person A returned,

so that Defendant **STEIN** could cause the award of the contracts to Co-conspirator Six.

34.  On or about January 31, 2004, Co-conspirator Six responded, stating that he was working on the bids and, within an hour, would bring the bids and "five dummies per bid."

35.  On or about February 9, 2004, at the direction of Defendant **STEIN**, Co-conspirator Six wire transferred $39,578 from his account with Credit Bank of Iraq to the arms manufacturer's account in Illinois.

36.  On or about February 18, 2004, Co-conspirator Six sent an e-mail to a one of his company's employees, with a copy to Defendant **STEIN**, stating that **STEIN** was working with Co-conspirator Six and had the title of Vice President of Operations for Co-conspirator Six's company.

37.  On or about February 19, 2004, Defendant **STEIN** sent an e-mail in response to Co-conspirator Six's e-mail of February 18, 2004, stating that he would like his business cards to read "Robert J. Stein, Jr.," and advising Co-Conspirator Six that Co-conspirator Two was happy because Co-conspirator Six agreed to buy a Rolex watch for Co-conspirator Two's spouse.

38.  On or about February 20, 2004, Defendant **STEIN** caused the award of CPA contract number 8167 for the demolition of the Ba'ath Party Headquarters in Al-Hillah, Iraq to a company controlled by Co-conspirator Six.

12

39.  On or about February 21, 2004, Defendant **STEIN** authorized a $452,800 cash payment to Co-conspirator Six on CPA Form 44 for performance on contract number 8167.

40. On or about February 25, 2004, Defendant **STEIN** sent the an e-mail to Co-conspirator Six regarding a payment to Co-conspirator Two.

41.  On or about February 25, 2004, Co-conspirator Six sent Defendant **STEIN** an e-mail advising him that he sent funds for Co-conspirator Two a week ago.

42.  On or about February 27, 2004, Defendant **STEIN** sent an e-mail to Co-conspirator Six asking whether he should give Co-conspirator $50,000 or $60,000 "to shut him up."

43.  On or about February 27, 2004, Defendant **STEIN** received an e-mail from Co-conspirator Six advising him that he had already paid Co-conspirator Two $110,000.

44.  On or about March 15, 2004, Defendant **STEIN** caused the award of CPA contract number 8265 for upgrades to the security facility for the Al-Hillah Police Academy to a company controlled by Co-conspirator Six.

45.  On or about March 15, 2004, Defendant **STEIN** and others authorized a $200,000 payment to Co-conspirator Six on CPA Form 44 for performance on contract number 8265.

46.  On or about March 15, 2004, at the direction of Defendant **STEIN**, Co-conspirator Six wire transferred $201,970

from his account with Credit Bank of Iraq to the arms
manufacturer's account in Minnesota.

47.  On or about March 15, 2004, Defendant **STEIN** and others
caused the award of CPA contract number 8339 for the renovation
of the public library in Karbala, Iraq to a company controlled by
Co-conspirator Six.

48.  On or about March 30, 2004, Defendant **STEIN** authorized
a $373,400 payment to Co-conspirator Six on CPA Form 44 for
performance on CPA contract number 8339.

49.  On or about April 1, 2004, Defendant **STEIN** and others
caused the award of CPA contract number 8345 to provide internet
capabilities for the public library in Karbala, Iraq to a company
controlled by Co-conspirator Six.

50.  On or about April 3, 2004, Defendant **STEIN** authorized a
$498,900 payment to Co-conspirator Six on CPA Form 44 for
performance on CPA contract number 8345.

51.  On or about April 5, 2004, Defendant **STEIN** and others
authorized a $248,500 payment to Co-conspirator Six on CPA Form
44 for performance on contract Number 8265.

52. On or about May 6, 2004, Co-conspirator Two sent an e-
mail to Co-conspirator Six providing him with information about
the SUV that Co-conspirator Six would purchase for Co-conspirator
Two.

53.  On or about May 9, 2004, Defendant **STEIN** sent an e-mail

14

to Co-conspirator Two reminding him that Co-conspirator Six was to receive certain military equipment "when things wind down."

54.  On or about May 19, 2004, Defendant **STEIN** directed Co-conspirator Four to "stash away" approximately $420,000 in currency.

55.  On or about June 20, 2004, Co-conspirator One sent an e-mail to Co-conspirator Six inquiring about the status of the car he requested from Co-conspirator Six.

56.  On or about June 25, 2004, Co-conspirator Six received an e-mail from Person D regarding the car requested by Co-conspirator One.

57.  On or about June 25, 2004, Defendant **STEIN** sent an e-mail to Co-conspirator One telling him to be careful what he tells Person C and that Defendant **STEIN** was doing his "best to keep a formal investigation from happening."

58.  On or about July 2, 2004, Co-conspirator Four smuggled approximately $300,000 of stolen currency into the United States.

59.  In or about July 2004, Co-conspirator Four sent by Federal Express to a business in California, at the direction of Defendant **STEIN**, stolen currency that she had smuggled into the United States from Iraq.

60.  On or about July 7, 2004, Co-conspirators Three and Four obtained illegal and unauthorized weapons through false

15

pretenses and transported them from Ft. Bragg, North Carolina to a hotel in the Fayetteville, North Carolina area.

61. On or about July 10, 2004, Defendant **STEIN** and Co-conspirators Three and Four transported the illegal and unauthorized weapons from a hotel to Defendant **STEIN**'s garage in Hope Mills, North Carolina, where certain weapons, including several .45 caliber pistols and .45 caliber silencers, and a SA58 .308 caliber machine gun were taken for the personal use of Co-conspirators Three and Four and transported from North Carolina to, respectively, Wisconsin and New Jersey, leaving the remaining weapons in Defendant **STEIN**'S garage.

62. On or about August 24, 2004, at the direction of Defendant **STEIN**, Co-conspirator Six wire transferred $69,620 from his account with Deutsche Bank Trust Co. to an arms manufacturer's bank account in Virginia.

63. In or about August 2004, Co-conspirator Four sent by Federal Express to Defendant **STEIN** a portion of the stolen currency that she had smuggled into the United States from Iraq.

64. On or about August 24, 2004, Co-conspirator Four sent an e-mail to Co-conspirator Six, copy to Defendant **STEIN** and Person D, regarding the Cadillac Escalade that Co-conspirator Six was purchasing for her.

16

65.  On or about September 2, 2004, Co-conspirator Four sent an e-mail to Co-conspirator Six thanking him for the Cadillac Escalade.

66.  On or about September 3, 2004, Co-conspirator Four sent an e-mail to Defendant **STEIN** asking whether she could count on Co-conspirator Six for a "payback" and wanting to know how much she would get in the end.

67.  In or about October 2004, Co-conspirator Four sent by Federal Express to Defendant **STEIN** a portion of the stolen currency that she had smuggled into the United States from Iraq.

68.  In or about December 2004, Co-conspirator Four sent by Federal Express to Defendant **STEIN** a portion of the stolen currency that she had smuggled into the United States from Iraq.

69.  On or about the following dates, Co-conspirator Six caused the following wire transfers of funds to be sent to Defendant **STEIN** or his spouse or others acting on **STEIN**'s behalf, or to **STEIN**'s coconspirators or their spouses or persons acting on their behalf, from foreign bank accounts Co-conspirator Six controlled:

| Date | Amount | Description |
|------|--------|-------------|
| 1/15/04 | $30,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 1/27/04 | $6,500 | Transfer for benefit of **STEIN** (for the purchase of jewelry, from a jeweler in North Carolina) |

17

| 1/29/04 | $70,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 2/9/04 | $50,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 2/9/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 2/17/04 | $50,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 3/2/04 | $50,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 3/3/04 | $15,000 | Transfer for benefit of **STEIN** (for the purchase of jewelry) |
| 3/15/04 | $15,000 | Transfer for benefit of **STEIN** (for the purchase of jewelry) |
| 3/15/04 | $50,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 3/29/04 | $140,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 3/29/04 | $100,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 4/7/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Romania to a bank in California) |
| 4/26/2004 | $9,475 | Transfer for benefit of **STEIN** (for the purchase of an automobile) |
| 4/27/04 | $1,973 | Transfer for benefit of **STEIN** (for the purchase of an automobile) |
| 4/28/04 | $60,017 | Transfer for benefit of **STEIN** (for the purchase of an automobile) |
| 5/3/04 | $40,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 5/3/04 | $25,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |

| 5/3/04 | $35,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
|--------|---------|-------------------------------------------------------------------|
| 5/5/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 6/2/04 | $35,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 6/3/04 | $5,523 | Transfer for benefit of Co-conspirator Two (for the purchase of an automobile) |
| 6/4/04 | $44,261 | Transfer for benefit of Co-conspirator Two (for the purchase of an automobile) |
| 7/6/04 | $20,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 7/6/04 | $25,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 7/6/04 | $75,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 7/6/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 7/20/04 | $14,968 | Transfer for benefit of **STEIN** (for the purchase of a recreational vehicle) |
| 8/10/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/19/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/25/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to an automobile dealer in New Jersey). |
| 9/13/04 | $124,962 | Transfer for benefit of **STEIN** (for the purchase of a recreational vehicle) |
| | | Transfer for benefit of **STEIN** (from a bank in Switzerland to |

| 9/27/04 | $30,000 | a bank in North Carolina) |
| 9/30/04 | $8,472 | Transfer for benefit of **STEIN** (for the purchase of a recreational vehicle) |
| 10/20/04 | $33,000 | Transfer for benefit of **STEIN** (from a bank in Switzerland to a bank in North Carolina) |

**All in violation of Title 18, United States Code, Section 371.**

### COUNT TWO
### 18 U.S.C. § 201
### (Bribery)

70.   Paragraphs 2 through 69 of this Information are incorporated by reference as if fully stated herein, and the following is further alleged:

71.   Beginning in or about December 2003 and continuing until at least in or about December 2004, the exact dates being unknown to the grand jury, in Al-Hillah, Iraq and elsewhere, Defendant,

#### Robert J. STEIN, Jr.

a public official, directly and indirectly did corruptly demand, seek, receive, accept, and agree to receive and accept something of value in return for being influenced in the performance of official acts and for being induced to do or omit to do acts in violation of a lawful duty; that is Defendant **STEIN** solicited and received money and goods from Co-conspirator Six in return for using and agreeing to use his official position to violate CPA and DOD procurement regulations and other laws in order to award

20

CPA contracts to Co-conspirator Six's companies and arrange for payment on those contracts to Co-conspirator Six.

**All in violation of Title 18, United States Code, Section 201.**

### Count Three
### 18 U.S.C. § 1956(h)
### (Money Laundering Conspiracy)

72.    Paragraphs 2 through 69 of this Information are incorporated by reference as if fully stated herein.

73.    From in or about December 2003 to in or about December 2005, in Iraq and elsewhere, Defendant

### Robert J. STEIN, Jr.

unlawfully and knowingly conspired, combined, confederated and agreed with Co-conspirators One, Two, Three, Four, and Six, and with other individuals known and unknown, to commit money laundering in violation of Title 18, United States Code, Sections 1956(h), 1956(a) and 1957.

74.    In connection with such conspiracy, Defendant **STEIN** and others:

a.    conducted and attempted to conduct financial transactions, affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, namely wire fraud in violation of Title 18, U.S. Code, Section 1343, bribery in violation of Title 18, U.S. Code, Section 201, and the interstate transportation of stolen property in violation of Title 18, U.S. Code, Section 2314, with the

21

intent to promote the carrying on of such specified unlawful

activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i);

    b.   conducted and attempted to conduct financial

transactions, affecting interstate and foreign commerce, which

transactions involved the proceeds of specified unlawful

activity, namely wire fraud in violation of Title 18, U.S. Code,

Section 1343, bribery in violation of Title 18, U.S. Code,

Section 201, and the interstate transportation of stolen property

in violation of Title 18, U.S. Code, Section 2314, with the

intent to conceal the source, nature, origin, ownership and

control of the proceeds of such specified unlawful activity, in

violation of 18 U.S.C. § 1956(a)(1)(B)(i);

    c.   caused or facilitated the transfer of a monetary

instrument and funds from or through a place outside the United

States to a place inside the United States with the intent to

promote the carrying on of a specified unlawful activity, namely

wire fraud in violation of Title 18, U.S. Code, Section 1343,

bribery in violation of Title 18, U.S. Code, Section 201, and the

interstate transportation of stolen property in violation of

Title 18, U.S. Code, Section 2314, in violation of 18 U.S.C. §

1956(a)(2)(A);

    d.   caused or facilitated the knowing transport and

transfer, and attempt to transport and transfer, monetary

instruments and funds from a place outside the United States to a

place in the United States knowing that the monetary instruments

and funds involved in the transportation represented the proceeds

of some form of unlawful activity and knowing that such

transportation was designed in whole or in part to conceal and

disguise the nature, location, source, origin, ownership and

control of the proceeds of specified unlawful activity, namely

wire fraud in violation of Title 18, U.S. Code, Section 1343,

bribery in violation of Title 18, U.S. Code, Section 201, and the

interstate transportation of stolen property in violation of

Title 18, U.S. Code, Section 2314, in violation of 18 U.S.C. §

1956(a)(2)(B)(i);

      e.    caused or facilitated the knowing transport and

transfer, and attempt to transport and transfer, monetary

instruments and funds from a place outside the United States to a

place in the United States knowing that the monetary instruments

and funds involved in the transportation represented the proceeds

of some form of unlawful activity and knowing that such

transportation was designed in whole or in part to avoid a

transaction reporting requirements under state or federal law, in

violation of 18 U.S.C. § 1956(a)(2)(B)(ii); and

      f.    engaged or attempted to engage in monetary

transactions, by, through or to a financial institution, in

criminally derived property that was of a value greater than

$10,000, knowing that such property was derived from unlawful

23

activity and such property was, in fact, derived from specified

unlawful activity, namely wire fraud in violation of Title 18,

U.S. Code, Section 1343, bribery in violation of Title 18, U.S.

Code, Section 201, and the interstate transportation of stolen

property in violation of Title 18, U.S. Code, Section 2314, in

violation of 18 U.S.C. § 1957.

**THE CONSPIRACY AND ITS OBJECTS**

75.   It was an object of the conspiracy for Defendant **STEIN**,

Co-conspirator Six, and Co-conspirators One, Two, Three and Four,

as well as with others known and unknown, to engage in money

laundering in violation of Title 18, United States Code Sections

1956 and 1957, by:

a. causing or attempting to cause financial

transactions, including but not limited to wire transfers and

bank deposits, affecting interstate and foreign commerce,

involving the proceeds of specified unlawful activity, for the

purpose of paying kickbacks and bribes to Defendant **STEIN** and

others in connection with the fraudulent award of contracts to

Co-conspirator Six;

b. causing or attempting to cause the transfer of funds

or monetary instruments, representing the proceeds of specified

unlawful activity, from places outside the United States to

places inside the United States including but not limited to wire

transfers and bulk currency smuggling facilitated and concealed

24

through the use of false documents, nominee corporations and corporations controlled by or through Co-conspirator Six; and

c. engaging or attempting to engage in monetary transactions in criminally derived property of a value greater than $10,000, by through or to financial institutions, stemming from the conspiracy to obtain money and property from the CPA and others in Iraq through bribes, kickbacks, payments on fraudulent contracts, and through the theft of property as well as appropriated and DFI currency earmarked and designated for the reconstruction of Iraq.

## MANNER AND MEANS OF THE CONSPIRACY

76. It was a part of the conspiracy that, in order to promote the ongoing fraud conspiracy alleged in Count 1 and to conceal the source, nature, origin, ownership and control of the proceeds of specified unlawful activity, Defendant **STEIN** and others would cause or attempt to cause wire transfers or other financial transactions to be sent to bank accounts that Defendant **STEIN** and others owned or controlled from foreign bank accounts owned or controlled by Co-conspirator Six, including but not limited to the following transactions:

| Date | Amount | Description |
|------|--------|-------------|
| 1/15/04 | $30,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |

| | | |
|---|---|---|
| 1/27/04 | $6,500 | Transfer for benefit of **STEIN** (for the purchase of jewelry, from a jeweler in North Carolina) |
| 1/29/04 | $70,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 2/9/04 | $50,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 2/9/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 2/17/04 | $50,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 3/2/04 | $50,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 3/3/04 | $15,000 | Transfer for benefit of **STEIN** (for the purchase of jewelry) |
| 3/15/04 | $15,000 | Transfer for benefit of **STEIN** (for the purchase of jewelry) |
| 3/15/04 | $50,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 3/29/04 | $140,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 3/29/04 | $100,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 4/7/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Romania to a bank in California) |
| 4/26/2004 | $9,475 | Transfer for benefit of **STEIN** (for the purchase of an automobile) |
| 4/27/04 | $1,973 | Transfer for benefit of **STEIN** (for the purchase of an automobile) |
| 4/28/04 | $60,017 | Transfer for benefit of **STEIN** (for the purchase of an automobile) |
| 5/3/04 | $40,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| | | Transfer for benefit of **STEIN** (for the purchase of real estate |

| 5/3/04 | $25,000 | in Hope Mills, North Carolina) |
|--------|---------|-------------------------------|
| 5/3/04 | $35,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 5/5/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 6/2/04 | $35,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 6/3/04 | $5,523 | Transfer for benefit of Co-conspirator Two (for the purchase of an automobile) |
| 6/4/04 | $44,261 | Transfer for benefit of Co-conspirator Two (for the purchase of an automobile) |
| 7/6/04 | $20,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 7/6/04 | $25,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 7/6/04 | $75,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 7/6/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 7/20/04 | $14,968 | Transfer for benefit of **STEIN** (for the purchase of a recreational vehicle) |
| 8/10/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/19/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/25/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to an automobile dealer in New Jersey). |
| 9/13/04 | $124,962 | Transfer for benefit of **STEIN** (for the purchase of a recreational vehicle) |

| 9/27/04 | $30,000 | Transfer for benefit of **STEIN** (from a bank in Switzerland to a bank in North Carolina) |
| 9/30/04 | $8,472 | Transfer for benefit of **STEIN** (for the purchase of a recreational vehicle) |
| 10/20/04 | $33,000 | Transfer for benefit of **STEIN** (from a bank in Switzerland to a bank in North Carolina) |

77.   It was further a part of the conspiracy that Defendant **STEIN** and others would engage or attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, by through or to a financial institution, with such property being derived from specified unlawful activity, including but not limited to the following transactions in the approximate amounts and dates listed below:

| Date | Amount | Description |
|------|--------|-------------|
| 1/22/04 | $19,500 | Payment to a law firm for the benefit of Defendant **STEIN**. |
| 2/9/04 | $34,791 | Payment to a North Carolina automobile dealer for the benefit of Defendant **STEIN**. |
| 2/13/04 | $40,000 | Interbank transfer for the benefit of Co-conspirator Two. |
| 3/3/04 | $15,000 | Payment to a North Carolina jewelry company for the benefit of Defendant **STEIN**. |
| 3/15/04 | $15,000 | Payment to a North Carolina jewelry company for the benefit of Defendant **STEIN**. |
| 4/21/04 | $19,311 | Payment to a home improvements company for the benefit of Defendant **STEIN**. |
| 4/28/04 | $60,017 | Payment to a car dealer for the benefit of Defendant **STEIN**. |
| 6/2/04 | $22,024 | Payment to a motorcycle dealer for the benefit of Co-conspirator Two. |

| 8/2/04 | $107,000 | Interbank transfer for the benefit of Co-conspirator Two. |
| 8/3/04 | $80,000 | Transfer to investment account for the benefit of Co-conspirator Two. |
| 9/16/04 | $10,527 | Payment to a cabinet company for the benefit of Co-conspirator Four. |
| 10/8/04 | $30,971 | Payment to a North Carolina auto dealer for benefit of Defendant **STEIN**. |
| 4/8/05 | $20,000 | Transfer from investment account for the benefit of Co-conspirator Two. |
| 11/11/05 | $11,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |

78.  It was further a part of the conspiracy that Defendant **STEIN**, Co-conspirator Four and others would structure payments, or cause the structuring of payments, to home improvements companies, car dealerships and others in an attempt to avoid scrutiny by the Internal Revenue Service and others, to evade the reporting requirements of federal law, and in attempt to evade the threshold of 18 U.S.C. § 1957. Transactions which the Co-conspirators caused or attempted to cause for such purposes include, but are not limited to, the following in the approximate amounts and dates listed below:

| Date | Amount | Description |
| --- | --- | --- |
| 8/10/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/19/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| | | |

| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
|---------|--------|----------------------------------------------------------------------------------------------------|
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/25/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 10/5/04 | $9,655 | Payment to home improvements company for the benefit of Defendant **STEIN**. |
| 10/7/04 | $9,655 | Payment to home improvements company for the benefit of Defendant **STEIN**. |
| 10/11/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 11/12/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 11/24/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 12/15/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |

All in violation of Title 18, United States Code, Section 1956(h).

### Count Four
### 18 U.S.C. § 922(g)(1)
### (Felon in Possession of Firearm)

79.   Paragraphs 2 through 69 and 73 through 78 of this Information are incorporated by reference as if fully stated herein.

80.   In July 1996, Defendant

**Robert J. STEIN, Jr.**

30

was convicted of access device fraud, in violation of 18 U.S.C.
§ 1029, in the U.S. District Court for the Eastern District of
North Carolina.

81. On or about the November 13, 2005, in Hope Mills,
North Carolina, Defendant **STEIN**, having been convicted of a
crime punishable by imprisonment for a term exceeding one year,
did knowingly possess numerous firearms including two
machineguns, a HK53A3 Submachine Gun, Serial Number 76-116138,
and a HK SA58 Rifle .308 Machine Gun Serial Number DS 23753, in
and affecting commerce.

**All in violation of Title 18, United States Code, Section
922(g)(1).**

### Count Five
### 18 U.S.C. §§ 922(o) & 2
### (Possession and Transfer of a Machine Gun)

82. Paragraphs 2 through 69 and 73 through 78 of this
Information are incorporated by reference as if fully stated
herein.

83. On or about November 13, 2005, in Hope Mills, North
Carolina, and elsewhere Defendant

### Robert J. STEIN, Jr.

did knowingly possess and transfer, and willfully aid, abet and
cause to be possessed and transferred, machine guns including,
a HK53A3 Submachine Gun, Serial Number 76-116138, and a HK SA58
Rifle .308 Machine Gun Serial Number DS 23753.

All in violation of Title 18, United States Code, Sections
922(o) and 2.

FORFEITURE

84.   Pursuant to Title 18, United States Code, Section
981(a)(1)(C) and Title 28, United States Code, Section 2461(c),
Defendant

**Robert J. STEIN, Jr.**

once convicted of Count 1 (conspiracy in violation of 18 U.S.C.
§ 371) shall forfeit to the United States the following
property:

a. Any property, real or personal, which constitutes
or is derived from proceeds traceable to the offense.

b.  A sum of money equal to the total amount of
proceeds traceable to each offense, or to the conspiracy
to commit violations of Sections 201, 1343 and 2314, in
violation of 18 U.S.C. § 371, as charged in Count 1, for
which the defendant is convicted.  If more than one
defendant is convicted of an offense, the defendants so
convicted are jointly and severally liable for the amount
involved in such offense.

85.  Pursuant to Title 18, United States Code, Section
982, Defendant

**Robert J. STEIN, Jr.**

32

once convicted of Count 3 (money laundering conspiracy in violation of 18 U.S.C. § 1956(h)) shall forfeit to the United States the following property:

a. All right, title, and interest in any and all property involved in violation of Title 18, United States Code, Section 1956, for which the defendant is convicted, and all property traceable to such property, including the following: 1) all money or other property that was the subject of each transaction, transportation, transmission or transfer in violation of Sections 1956 and 1957; 2) all commissions, fees and other property constituting proceeds obtained as a result of those violations; and 3) all property used in any manner or part to commit or to facilitate the commission of those violations.

b. A sum of money equal to the total amount of money involved in each offense, or involved in the conspiracy to commit violations of Sections 1956 and 1957, in violation of 18 U.S.C. § 1956(h), as charged in Count 3, for which the defendant is convicted. If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount involved in such offense.

33

86.    The property to be forfeited in connection with the convictions on Counts 1 and 3 includes but is not limited to the following:

1. one Porsche automobile, VIN WP0AB29953S696097, valued at approximately $160,000;

2. one Coach House RV, model 272XL, VIN 1FDXE45S64HBO856, valued at approximately $170,000;

3. a 2004 Toyota Sienna VIN 5TDZA22CX4S120818, valued at approximately $16,320;

4. a 2004 Chevrolet Colorado Truck 1GCDT136048222172, valued at approximately $13,730;

5. a 2004 Lexus LS 430 VIN JTHBN36F840153933, valued at approximately $55,460;

6. Two plots of real property located at 5610 Spreading Branch Road, Hope Mills, NC 28348, the legal descriptions for which are identified as:

   • Lot 3 Fox Meadow, Sec 1, Plat Book 108, Page 37 CCR, Cumberland County, NC

   • Lot 21 Block B Rockfish Mebane, Cumberland County, NC;

7. approximately $164,900 deposited into Bragg Mutual Federal Credit Union account 3366588;

8. approximately $92,885.00 initially deposited into Bragg Mutual Federal Credit Union account 42825890;

9. approximately $210,000 initially deposited into First Citizens Bank account 000348807327;

10. various computers, including the following:

   • Dell Tower Dimension 8100
   • Sony Personal Computer
   • Toshiba Portege Personal Computer
   • Toshiba Satellite Computer

11. US Currency in the amount of $100,000.00

34

12. 2002 Eagle Silver Dollars;

13. Breitling watches with the following serial numbers 437469, 437848, 780889, and 3631224, and Breitling watches with the following identifying numbers;

- Breitling Watch A71365
- Breitling Watch B72345
- Breitling Watch A72345
- Breitling Watch L21330
- Breitling Watch A24422
- Breitling Watch A12023
- Breitling Watch E13360
- Breitling Watch A39363
- Breitling Watch A39362
- Breitling Watch D13022
- Breitling Watch A25362
- Breitling Watch D22222
- Breitling Watch A42362
- Breitling Watch E56321

14. a 6 ct. round diamond ring;

15. a 1.66 ct. sapphire ring;

16. a 1.12 ct. diamond ring;

17. a diamond and platinum ring;

18. three diamond rings;

19. a men's Avenger Chronometer;

20. a 2.54 ct. sapphire necklace;

21. two sets of diamond earrings;

22. a set of hoop earrings;

23. a diamond necklace;

24. a pearl necklace;

25. a set of pearl and diamond earrings;

26. a diamond tennis bracelet;

27. commemorative coins and currency;

28. Various firearms, including but not limited to the following:

- four grenade launchers;

- twenty fully automatic submachine guns;

- twelve .308 caliber machine guns;

- twelve .45 caliber pistols; and

- four .45 caliber silencers;

29. a 1965 Cessna T210F airplane Serial Number T210-0004.

87. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and Title 28 United States Code, Section 2461, each defendant shall forfeit substitute property, up to the value of the amount described in the foregoing paragraphs, if, by any act or omission of a defendant, the property described in such paragraphs, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold

to or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

**Criminal Forfeiture, in violation of Title 18, United States Code, Section 982(a); Title 18, United States Code, Section 981(a); and Title 28, United States Code, Section 2461.**

DATED: ____1/19____ , 2006, at Washington, DC.

                    FOR THE UNITED STATES

By:     _____
        Richard Weber, Chief
        Mark J. Yost, Trial Attorney
        Patrick Murphy, Trial Attorney
        Asset Forfeiture and Money
              Laundering Section

        Noel L. Hillman, Chief
        James A. Crowell IV, Trial Attorney
        Ann C. Brickley, Trial Attorney
        Public Integrity Section

        Paul E. Pelletier, Chief
        Fraud Section

        United States Department of Justice
        Criminal Division
        1400 New York Ave., NW
        Washington, DC 20005
        Mark.Yost@usdoj.gov
        Patrick.Murphy@usdoj.gov
        James.Crowell@usdoj.gov
        Ann.Brickley@usdoj.gov