IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )    Criminal No.
    )
    v.    )    Count One: 18 U.S.C. § 371
    )    (Conspiracy)
    )    Count Two: 18 U.S.C.
ROBERT J. STEIN, JR.,    )    § 201 (Bribery)
    )    Count Three: 18 U.S.C.
    Defendant.    )    § 1956(h) (Money Laundering
    )    Conspiracy)
    )    Count Four: 18 U.S.C. §
    )    922(g)(1)(Felon in Possession
    )    of Firearm)
    )    Count Five: 18 U.S.C. §§
    )    922(o)(Possession of a Machine
    )    Gun) and 2 (Aiding, Abetting,
    )    and Causing)

**FACTUAL BASIS FOR PLEA**

The United States of America, by and through the undersigned attorneys of the United States Department of Justice, Criminal Division, Asset Forfeiture and Money Laundering Section, Public Integrity Section, and Fraud Section, and the Defendant, ROBERT J. STEIN JR., personally and through his undersigned counsel, hereby stipulate to the following facts pursuant to United States Sentencing Guidelines § 6A1.1 and Rule 32(C)(1) of the Federal Rules of Criminal Procedure, that beginning in or about December, 2003, and continuing until approximately December, 2004, in Al-Hillah, Iraq and elsewhere:

1.    Defendant **STEIN** was a Department of Defense (DOD) contract employee, who served in various positions at the

Coalition Provisional Authority-South Central Region (CPA-SC) including Comptroller and funding officer and was assigned to the United States Embassy in Al-Hillah, Iraq.

2.   On May 8, 2003, the United States and the United Kingdom presented a joint letter to the United Nations stating that they "and Coalition partners, acting under existing command and control arrangements through the Commander of Coalition Forces, have created the Coalition Provisional Authority [CPA], which includes the Office of Reconstruction and Humanitarian Assistance [ORHA], to exercise powers of government temporarily, and, as necessary, especially to provide security, to allow the delivery of humanitarian aid, and to eliminate weapons of mass destruction."   The President of the United States appointed a United States Ambassador to serve as the Administrator of the CPA and thus the civil governing authority of Iraq but who remained subject to the President.

3.   In 2003, Congress appropriated $698 million in initial funding to the CPA for its daily operating budget as part of the Emergency Wartime Supplemental Appropriations Act.   Thereafter, the CPA conducted its operations and awarded contracts for projects intended to promote Iraq's reconstruction from several funding sources, including over $24.1 billion in funds appropriated in 2003-2004 by Congress from the General Funds of the United States as well as $2.1 billion in repatriated Iraqi

2

funds that were confiscated by the United States during the Gulf War in 1990. The United States deposited $210 million of the repatriated funds into a CPA account known as the Development Fund for Iraq (DFI) which in addition to the United States' deposits, also included Iraqi funds derived from oil sales.

4.    The CPA was primarily staffed by Department of Defense (DOD) employees, including civilians and members of the military forces detailed to the CPA ("DOD employees"), as well as DOD contractors and subcontractors, who were responsible for the management, accounting, and expenditure of all of the aforementioned funds.

5.    In order to enter into contracts for the rebuilding of Iraq, the CPA used DOD contracting forms and procedures as well as creating CPA-specific contracting forms and procedures. The CPA promulgated its procedures in the CPA Contracting Memorandum which referenced and incorporated the competition, transparency and accountability standards applicable to federally-funded DOD contracts. As examples, the CPA utilized CPA Form 44 to authorize small payments (called "micropurchases") on CPA contracts for less than $15,000, and it established monetary limits on the contracts that could be approved by certain officials.

6.    CPA contracting rules prohibited the use of appropriated or DFI funds to purchase weapons.

3

7.    In his official capacity, Defendant **STEIN** controlled the expenditure of over $82 million dollars in funds, including appropriated and DFI funds that were to be used for the payment of contract services rendered in Al-Hillah, Iraq for the rebuilding of Iraq.  Prior to working for the CPA, in July 1996, Defendant **STEIN** was convicted of access device fraud, in violation of 18 U.S.C. § 1029, in the U.S. District Court for the Eastern District of North Carolina.

8.    Co-Conspirator One is an officer in the United States Army Reserve, a DOD component.  During times relevant to this Information, Co-conspirator One served as the Chief of Staff for the CPA-SC, and was responsible for supervising the CPA personnel who award contracts related to the reconstruction of Iraq and made payments for the CPA-SC in Al Hillah, Iraq, including Defendant **STEIN**.

9.    Co-conspirators Two, Three, Four and Five are officers in the United States Army Reserve.  During relevant times, each served under the direct supervision of Co-Conspirator One at the CPA-SC in Al-Hillah, Iraq.  Co-conspirator Two and Three's duties included serving as advisors and project officers on projects for the reconstruction of Iraq which involved recommending the expenditure of CPA funds for the reconstruction of Iraq.  Co-conspirator Four's duties included serving as the Deputy Comptroller to Defendant **STEIN** and, in his absence, she served as

4

the acting Comptroller for the CPA-SC.  Co-conspirator Five was a
contract officer responsible for administering contracts entered
into by the CPA and private contractors doing business in Iraq.

10.   Co-Conspirator Six is a United States citizen who
operated and controlled construction and service companies in
Iraq and Romania, which did business with the CPA-SC in Al-
Hillah, Iraq.

11.   During relevant times, Persons A, B, C, D, E, I, J and
K were public officials working for or with the CPA in the United
States' reconstruction efforts in Iraq.  Person F owned and
operated a financial services business outside the United States.
Person G is the spouse of Co-conspirator Two.  Person H was an
employee of Co-conspirator Six's business.

### THE SCHEME

12.   Defendant **STEIN** used his official position and the
official positions of Co-conspirators One, Two, Three, Four, Five
and others to violate CPA and DOD procurement regulations and
other laws in order to steer contracts to Co-Conspirator Six's
companies and arrange for payment on those contracts to Co-
Conspirator Six in return for Co-conspirator Six providing
Defendant **STEIN** and others with money, goods, and other items of
value, including the service of laundering currency that
Defendant Stein and others stole from the CPA.

13.   Defendant **STEIN** and his co-conspirators recommended

5

numerous construction projects in Al-Hillah, Iraq that were
intended to be, and were in fact, steered to Co-Conspirator Six
and his companies through a rigged bidding process.

14. Defendant **STEIN** used his official position and those of
his co-conspirators to structure the contracts awarded to Co-
Conspirator Six in amounts under $500,000, which was the dollar
limit of Defendant **STEIN**'s contracting authority, in order to
conceal the transactions with Co-Conspirator Six and avoid
scrutiny by the CPA's auditors in Baghdad, Iraq, and others.

15. Defendant **STEIN** used his official position and those of
his co-conspirators to cause or authorize the payment of the
fraudulently awarded contracts to Co-Conspirator Six and his
companies. In particular, Defendant **STEIN** authorized payments on
CPA Form 44, exceeding without authorization its $15,000 payment
ceiling.

16. Defendant **STEIN** used his official position and those of
his co-conspirators to facilitate Co-Conspirator Six's submission
of multiple bids on the same CPA contract in the names of
different companies which were either non-existent or controlled
by Co-Conspirator Six. The bids submitted included both the
"low" bid and several "high" bids which enabled Defendant **STEIN**
and others to steer over $8,641,375 in contracts to Co-
Conspirator Six and his companies.

17. The profit margin on all of the fraudulently awarded

6

contracts to Co-conspirator Six was at least 25 percent or higher.

18. Defendant **STEIN** used his official position and those of his co-conspirators to solicit and accept money and other things of value, such as secret employment or potential future employment, business or first class plane tickets, watches and other jewelry, alcohol, cigars, sexual favors from women provided by Co-Conspirator Six at his villa in Baghdad, and money laundering services, all from Co-Conspirator Six in exchange for taking official action favorable to Co-Conspirator Six or for refraining from taking action that was unfavorable to Co-Conspirator Six and his interests.

19. Defendant **STEIN** used his official position and those of his co-conspirators to steal CPA and United States property located in Iraq and conveyed that property to Co-conspirator Six. The stolen property included real property and government-owned or acquired personal property such as body armor and other military equipment.

20. Defendant **STEIN** used his official position and those of his co-conspirators to steal at least $2,000,000 in United States currency including appropriated and DFI funds that were designated to be used for the reconstruction of Iraq. A portion of the stolen currency was smuggled into the United States by Defendant **STEIN** and his co-conspirators via commercial aircraft.

Defendant **STEIN** and others also delivered some of the stolen currency to Co-Conspirator Six, who, knowing that the currency was stolen, deposited it in foreign bank accounts, including accounts under his control in Iraq, Switzerland, Romania and Amsterdam. At least a portion of these funds were then transferred to bank accounts controlled by Defendant **STEIN** or his co-conspirators, or Co-Conspirator Six made payments on their behalf to purchase real estate, cars, a motorcycle, a recreational vehicle and jewelry.

21. In addition to the bribe payments Co-conspirator Six made to Defendant **STEIN's** co-conspirators and others, Defendant **STEIN** personally accepted at least $1,082,279 in direct bribe payments in the form of money and goods from Co-conspirator Six.

22. In addition to the CPA cash and goods that Defendant **STEIN** stole or helped his co-conspirators steal from the CPA for their benefit, Defendant **STEIN** stole and converted to his own personal use CPA cash and goods totaling at least $600,000.

23. Defendant **STEIN**, and Co-conspirators One, Two, Three, Four, and Six, and others laundered the stolen appropriated and DFI funds, as well as the direct bribe payments from Co-conspirator Six, in order to disguise the nature, source, origin and control of the money and to promote and facilitate the payment of the kickbacks and bribes to Defendant **STEIN** and others

8

in connection with the fraudulent award of contracts to Co-Conspirator Six.

24.   Defendant **STEIN** and his co-conspirators caused the transfer of funds and monetary instruments, representing the proceeds of specified unlawful activity in Iraq and elsewhere, from places outside the United States to places inside the United States including but not limited to wire transfers and bulk currency smuggling facilitated through the use of false documents, nominee corporations and corporations controlled by or through Co-Conspirator Six.

25.   Defendant **STEIN** and his co-conspirators engaged in monetary transactions in criminally derived property of a value greater than $10,000, by through or to financial institutions, stemming from the conspiracy to obtain money and property from the CPA and others in Iraq through bribes, kickbacks, payments on fraudulent contracts, and through the theft of property including appropriated and DFI currency earmarked and designated for the reconstruction of Iraq.

26.   Defendant **STEIN** used his official position and those of his co-conspirators to purchase firearms and related weaponry in Illinois, Minnesota, North Carolina, and Virginia.  Defendant **Stein** used appropriated and CPA funds to purchase these firearms which he then converted to his and his co-conspirators's use in a private security business intended to be operated by Defendant

9

STEIN, his co-conspirators and others in Iraq and elsewhere. Defendant STEIN also provided firearms to his co-conspirators in return for their assistance in helping Defendant STEIN illegally obtain firearms.

27.    Defendant STEIN had his co-conspirators purchase numerous firearms in the United States on behalf of Defendant STEIN but in his co-conspirators's names in order to circumvent the federal firearms laws that prohibited Defendant STEIN from purchasing and possessing firearms.

28. Defendant STEIN used his official position and those of his co-conspirators to obtain currency from CPA appropriated and DFI funds which he then provided to Co-conspirator Six, who then caused the wire transfer of such funds from various accounts in Germany, Iraq, Romania and elsewhere to the firearms manufacturers in the United States in payment for the unauthorized purchases Defendant STEIN had made.

29.    Defendant STEIN used his official position and those of his co-conspirators to falsify numerous DOD and CPA documents in order to make the firearms purchases appear to be legitimate purchases by and for the United States' reconstruction efforts in Iraq.

30.    In order to accomplish the crimes charged in the Information, Defendant STEIN used his official position and those of his co-conspirators to do the following:

a.   On or about January 1, 2004, Co-Conspirator Six sent Defendant **STEIN** an e-mail directing him to get Co-conspirator Two "on board."

b.   On or about January 3, 2004, Defendant **STEIN** sent the following e-mail:

> **From**: [Defendant STEIN]
> **To**:  [Co-Conspirator Six]
> **Sent**: Saturday, January 03, 2004 8:29 PM
> **Subject**: Tomorrow
>
> [Co-Conspirator Six]
>
> FYI, [Co-conspirator Three] and I got the contract through of rhte (sic) ground prep at the police academy. I will give you 200K sometime tomorrow afternoon!
>
> I love to give you money.
>
> Bob

c.    On or about January 3, 2004, Defendant **STEIN** and Co-conspirator Three caused the award of CPA contract number 8016 in the amount of $491,000, involving building demolition at the Police Academy in Al Hillah, Iraq.

d.   On or about January 7, 2004, Defendant **STEIN** caused the award of CPA contract number 8023 to construct a Regional Tribal Democracy Center in Al-Hillah, Iraq to a company controlled by Co-Conspirator Six.

e.    On or about January 7, 2004, Defendant **STEIN** authorized a $200,000 cash payment to Co-Conspirator Six on CPA Form 44 for performance on contract number 8023.

11

f.  On or about January 13, 2004, Defendant **STEIN** provided Co-Conspirator Six with his bank account information and the bank's address by e-mail.

g.  On or about January 17, 2004, Defendant **STEIN** sent the following e-mail, which reads in relevant part:

> **From**: [Defendant **STEIN**]
> **To**: [Co-Conspirator Six]
> **Sent**: Saturday, January 17, 2004 8:51 PM
> **Subject**: Re: Update
>
> [Co-Conspirator Six]
>
> Yes, I would like to see you and get caught up to date. The meeting with [person B] went fine and he knows what I want and what he need (sic) to do! I have two contracts to award to you when I see you, the generator and the next phase of the police academy. I also have the money that you wired for [person C]. I told him 10,000 and to the one account.
>
> * * *
>
> I see a very properious (sic) future!
>
> Bob

h.  On or about January 22, 2004, Defendant **STEIN** sent the following e-mail:

> **From**: [Defendant **STEIN**]
> **To**: [Co-Conspirator Six]
> **Sent**: Thursday, January 22, 2004 7:44 PM
> **Subject**: Police Academy
>
> [Co-Conspirator Six]
>
> I was talking to [Co-conspirator Five] in contracting about your next set of projects. He is

12

ready to award everything to you but he asked me
if there was anyway we could use another name
other than [Co-Conspirator Six's company]? [Co-
conspirator Five] wants to make sure it doesn't
look like on the reports that go to Baghdad that
all the work is going to [Co-Conspirator Six's
company]. If you can, put your bid on new
letterhead I. I can award it tomorrow. Sorry to be
so business like but as you know I am doing
everything here with the apporoval (sic) process.
I would love to slow down just for a few days and
relax but I know I can't. I need to take care of
all of this stuff.

Bob

i.   On or about January 22, 2004, Co-Conspirator Six sent

the following reply e-mail:

**Re: Police Academy**
**From:** [Co-Conspirator Six]
**Date:** Thu, 22 Jan 2004 20:21:23 +0300
**To:** [Defendant **STEIN**]

Bob: I will do that for Phases 7-10 on Eastview
trading and another company I own. Since we are
paid in cash it really doesn't matter tax wise..
See you tomorrow.

[Co-Conspirator Six]

j.   On or about January 26, 2004, Co-Conspirator Six sent

the following e-mail to Co-Conspirator Three:

**From:** [Co-conspirator Six]
**Sent:** Monday, January 26, 2004 12:39 PM
**To:** [Co-conspirator Three]
**Subject:** Fw: Bid Schedule[Co-Conspirator Six's
company].xls

[Co-conspirator Three]:

Attached is the bid proposal you requested. Work

13

> can start in one day after the award. Let me know
> if you want this on [Co-Conspirator Six's company]
> or one of our other companies?
>
> [Co-Conspirator Six]

k.   On or about January 26, 2004, Defendant **STEIN**, signed a

DOD Standard Form 1449 contract with a U.S. arms manufacturer

based in Sterling, Virginia that provided that the CPA, using

appropriated U.S. funds, would purchase the following weapons

(the "unauthorized weapons") that were delivered to Fort Bragg,

North Carolina, where under the terms of the contract Co-

conspirator One would take possession of the weapons:

> a.   four grenade launchers;
>
> b.   twenty fully automatic submachine guns;
>
> c.   twelve .308 caliber machine guns;
>
> d.   twelve .45 caliber pistols; and
>
> e.   four .45 caliber silencers.

l.   On or about January 27, 2004, Defendant **STEIN** sent the

following e-mail:

> **From**: [Defendant **STEIN**]
> **To**: [Co-Conspirator Six]
> **Sent**: Tuesday, January 27, 2004 1:02 AM
> **Subject**: Thoughts
>
> [Co-Conspirator Six]
>
> Courious (sic) about what [person D] had to say. I will
> warn you to be very careful what you say around him. If
> he ever knows what we are doing he will want "his cut"!
> Remember what I told you, he is a player trying to get
> whatever he can. If he ever knows something about a
> person he will use it to his advantage.

We have come only a short way and we have much further
to go. The fewer people who know what we are doing the
better. I am your partner as you put it so trust in me
and what I feel.

Bob

m.  On or about January 27, 2004, Defendant **STEIN** sent the

following e-mail:

> **From**: [Defendant **STEIN**]
> **To**: [Co-Conspirator Six]
> **Sent**: Tuesday, January 27, 2004 8:14 PM
> **Subject**: Re: Update
>
> [Co-Conspirator Six]
>
> Thanks for the booze. That will give me some bargaining
> material here and there. The ex hasn't sent me an email
> yet if she received the funds. I am not worried. They
> will get there.
>
> [Co-conspirator Two] asked me if I heard you say that
> he was getting 100k for a bonus and his salary would be
> starting now. Also about the corporate card ect ect ect
> (sic). He hurts my head sometimes but we will work with
> him. I will get over the USAID (sic) and see [person J]
> in the next week and talk electriciry (sic) with her. I
> may need some information from you.
>
> Thanks again for everything....
>
> Bob
>
> PS: Don't (sic) give [Co-conspirator Two] the Booze, he
> will drink it!

n.  On or about January 29, 2004, Co-Conspirator Six sent an

e-mail with the following information to a GBG employee:

> I need business class tickets for [Co-conspirator Two]
> and His wife [person G]... can you check the routings
> and get back to me... [Co-Conspirator Six's company]

15

>will pay for this.... He is the head of the PA....very
important to us... I want to make sure its (sic) done
right. Can you get someone other than [person H] to
handle this. Thanks.

o.  On or about January 31, 2004, Defendant **STEIN** sent the

following e-mail:

>**From**: [Defendant **STEIN**]
>**To:** [Co-Conspirator Six]
>**Sent**: Saturday, January 31, 2004 8:43 AM
>**Subject**: Re: meeting
>
>[Co-Conspirator Six]
>
>Co-conspirator Three] need (sic) the bids for the work
>at the police academy. [Co-conspirator Two] needs the
>bids for the mobil (sic) command post for Police and
>Arch. If I (sic) don't get these today I may not be
>able to award them before [person A] gets back.

p.  On or about January 31, 2004, Co-Conspirator Six

responded with the following reply e-mail:

>**Subject: Re: meeting**
>**From**: [Co-Conspirator Six]
>**Date**: Sat, 31 Jan 2004 08:47:12 +0300
>**To**: [Defendant STEIN]
>
>I am working on them now... they will be ready in one
>hour... I will send you our bids and bring with me the
>dummies... I have five dummies per bid...ok..

q.  On or about February 9, 2004, at the direction of

Defendant **STEIN**, Co-Conspirator Six wire transferred $39,578 from

his account with Credit Bank of Iraq to the arms manufacturer's

account in Illinois.

r.  On or about February 18, 2004, Co-Conspirator Six sent

16

an e-mail to a one of his company's employees, with a copy to

Defendant **STEIN**, stating in relevant part:

> Bob STEIN is working with [Co-Conspirator Six's
> company] on many projects and has the title of **VICE
> PRESIDENT OF OPERATIONS**. I would like you to coordinate
> with him and to expedite whatever he requires on behalf
> of [Co-Conspirator Six's company]. He will have reports
> to be redone from time to time, calls to be made,
> research, etc. Please move quickly when asked.

> (Emphasis in original).

    s.  On or about February 19, 2004, Defendant **STEIN** sent the

following e-mail in response to Co-Conspirator Six's e-mail of

February 18, 2004:

> **From:** [Defendant **STEIN**]
> **To:** [Co-Conspirator Six]
> **Sent:** Thursday, February 19, 2004 8:05 AM
> **Subject:** Re: Fw: Bob STEIN

> [Co-conspirator Six],

> Thanks for this. I wanted to insure on my business card
> my name will be Robert J. STEIN. It sounds a bit better
> than "Bob". The watches arrived last night and [Co-
> Conspirator Two] is happy for now. He told me you are
> going to get a rolex for his wife. Thats fine (sic).

> Co-conspirator One] saw them and like (sic) them (sic)
> I probably give (sic) him my watch and just get another
> one for me. I want to keep him happy and on our side.
> There is a very good chance when CPA goes away he will
> go to work with the PMO. I think it is well worth the
> cost. What do you think?

> Bob

    t.  On or about February 20, 2004, Defendant **STEIN** caused

the award of CPA contract number 8167 for the demolition of the

Ba'ath Party Headquarters in Al-Hillah, Iraq to a company
controlled by Co-Conspirator Six.

      u.   On or about February 21, 2004, Defendant **STEIN**
authorized a $452,800 cash payment to Co-Conspirator Six on CPA
Form 44 for performance on contract number 8167.

      v.  On or about February 25, 2004, Defendant **STEIN** sent the
following e-mail to Co-Conspirator Six regarding a payment to Co-
conspirator Two:

> **From**: [Defendant **STEIN**]
> **To**: [Co-Conspirator Six]
> **Sent**: Wednesday, February 25, 2004 9:00 AM
> **Subject**: HOT
>
> Phil,
>
> FYI, [Co-conspirator Two] just left my office and he is
> pissed! I guess he was expecting the next chunk for 60
> sent and he got a call from his wife stating he had not
> received it.
>
> Bob

      w.   On or about February 25, 2004, Co-Conspirator Six sent
the following reply e-mail:

> **Subject: Re: HOT**
> **From**: [Co-Conspirator Six]
> **Date**: Wed, 25 Feb 2004 09:13:04 +0300
> **To**: [Defendant **STEIN**]
>
> This is bullshit... I sent the funds a week ago... I
> will double check....Tell him to stop acting like a
> child....

      x.  On or about February 27, 2004, Defendant **STEIN** sent the
following e-mail:

**From:** [Defendant **STEIN**]
**To:** [Co-Conspirator Six]
**Sent:** Friday, February 27, 2004 7:18 PM
**Subject:** Re: 27 FEB

[Co-conspirator Six]

Should I go ahead and give [Coconspirator Two] the 50 or 60 to shut him up?

Bob

y.   On or about February 27, 2004, Defendant **STEIN** received the following e-mail from Co-Conspirator Six:

**Subject: Re: 27 FEB**
**From:** [Co-Conspirator Six]
**Date:** Fri, 27 Feb 2004 19:24:37 +0300
**To:** [Defendant **STEIN**]

No... I sent the funds already.... this would make 170 not 110.... The funds went out..... what more does he want? This is your call...

z.   On or about March 15, 2004, Defendant **STEIN** caused the award of CPA contract number 8265 for upgrades to the security facility for the Al-Hillah Police Academy to a company controlled by Co-Conspirator Six.

aa.   On or about March 15, 2004, Defendant **STEIN** and others authorized a $200,000 payment to Co-Conspirator Six on CPA Form 44 for performance on contract number 8265.

bb.   On or about March 15, 2004, at the direction of Defendant **STEIN**, Co-Conspirator Six wire transferred $201,970 from his account with Credit Bank of Iraq to the arms manufacturer's account in Minnesota.

19

cc.  On or about March 15, 2004, Defendant **STEIN** and others caused the award of CPA contract number 8339 for the renovation of the public library in Karbala, Iraq to a company controlled by Co-Conspirator Six.

dd.  On or about March 30, 2004, Defendant **STEIN** authorized a $373,400 payment to Co-Conspirator Six on CPA Form 44 for performance on CPA contract number 8339.

ee.  On or about April 1, 2004, Defendant **STEIN** and others caused the award of CPA contract number 8345 to provide internet capabilities for the public library in Karbala, Iraq to a company controlled by Co-Conspirator Six.

ff.  On or about April 3, 2004, Defendant **STEIN** authorized a $498,900 payment to Co-Conspirator Six on CPA Form 44 for performance on CPA contract number 8345.

gg.  On or about April 5, 2004, Defendant **STEIN** and others authorized a $248,500 payment to Co-Conspirator Six on CPA Form 44 for performance on contract Number 8265.

hh. On or about May 6, 2004, Co-conspirator Two sent the following e-mail:

> **From:** [Coconspirator Two]
> **To:**  [Co-Conspirator Six]
> **Sent:** Thursday, May 06, 2004 11:13 PM
> **Subject:** car info
>
> Hi [Co-Conspirator Six],
> Here is the info you requested on the SUV I'd
> like.

20

>           Model: 2004 GMC Yukon Denali All Wheel Drive
>           Exterior: Summit White
>           Interior: Sandstone Leather
>           This vehicle is loaded and I don't think any
>           options are available. It has to meet California
>           emissions; shouldn't be an issue if its actually
>           sold in California.
>           The closest major city I live near is Santa Rosa,
>           California.
>           What additional information do you need?
>           Thanks Phil.
>
>           Let me know how I can help you with the local
>           stuff.
>
>           v/r [Co-conspirator Two]

ii.  On or about May 9, 2004, Defendant **STEIN** sent the

following e-mail:

>           From:  Defendant **STEIN**
>           Date:  Sunday, May 09, 2004 4:30 p.m.
>           To:    [Co-conspirator Two]
>           Subj:
>
>           [Co-conspirator Two]
>
>           With things winding down we need to make sure [Co-
>           conspirator Six] gets 10 - 12 sets of everything.
>           Vests, helmets so on and so forth. Remember, you
>           have 400 sets of carriers reroute (sic) and should
>           be there any day.  We need to talk about a few
>           other things too.

jj.  On or about May 19, 2004, Defendant **STEIN** directed Co-

Conspirator Four to "stash away" approximately $420,000 in

currency.

kk.  On or about June 20, 2004, Co-conspirator One sent an

e-mail to Co-Conspirator Six inquiring about the status of the

car he requested from Co-Conspirator Six.

11.  On or about June 25, 2004, Co-Conspirator Six received the following e-mail regarding the car requested by Co-conspirator One:

> **From:** [Person F]
> **To:** [Co-Conspirator Six]
> **Sent:** Friday, June 25, 2004 9:35 AM
> **Subject:** Blue Nissan 350Z
> PHIL:
> Your friend is seeking a very desirable, hard-to-find color: electric blue. It appears that there are only 2 blue Nissan 350Z hardtops in the western United States. [Coconspirator One] wants the following specifications: Touring model, manual transmission, Aerodynamics Package, Cargo Convenience Package, Floor Mats, Splash Guards, and Trunk Mat.
> There is a car in California that has all these features, plus a satellite radio. Cost (including shipping to Salt Lake City): $35,990.
> In Salt Lake City there is a similar car that is a Convenience model (not a Touring model), meaning that it has a Nissan radio (not a Boise radio), cloth seats rather than leather, and no heated seats. Everything else is the same, per [Co-conspirator One's] request. Cost: $31,595.
> Which of these would [Coconspirator One] prefer? (From a "value" point of view, the better deal is probably the second.)
> [Person F]
> P.S.: You say you want pictures. [Coconspirator One] knows all about the car. To see what the car looks like, the Nissan website is http://www.nissanusa.com/

mm.  On or about June 25, 2004, Defendant **STEIN** sent the following e-mail:

From: [Defendant STEIN]
Sent: Jun 25, 2004 4:29 AM
To: [Co-conspirator One]
Subject: Re: Urgent Please Respond ASAP

[Co-conspirator One],

Whatever you are telling [Person E] about anything
I wish you would let me know. [Person E] is
pushing some things here that could snowball out
of control. I don't care what you or [Co-
conspirator Two] thinks (sic) about anything. I am
doing my best to keep a formal investigation from
happening. We cleared 100% with DFI and R3P funds
in Baghdad. We have some lose ends with some of
[Person I's] stuff and some late fire equipment
coming in. They can be handled with EFT's. I would
like to know if you are going to stand behind me
or not!

Bob

nn.  On or about July 2, 2004, Co-conspirator Four smuggled
approximately $300,000 of stolen currency into the United States.

oo.  In or about July 2004, Co-conspirator Four sent by
Federal Express to a business in California, at the direction of
Defendant STEIN, stolen currency that she had smuggled into the
United States from Iraq.

pp.  On or about July 7, 2004, Co-conspirators Three and
Four obtained illegal and unauthorized weapons through false
pretenses and transported them from Ft. Bragg, North Carolina to
a hotel in the Fayetteville, North Carolina area.

qq.  On or about July 10, 2004, Defendant STEIN and Co-
conspirators Three and Four transported the illegal and
unauthorized weapons from a hotel to Defendant STEIN's garage in

23

Hope Mills, North Carolina, where certain weapons, including several .45 caliber pistols and .45 caliber silencers, and a SA58 .308 caliber machine gun were taken for the personal use of Co-conspirators Three and Four and transported from North Carolina to, respectively, Wisconsin and New Jersey, leaving the remaining weapons in Defendant **STEIN**'S garage.

rr.  On or about August 24, 2004, at the direction of Defendant **STEIN**, Co-Conspirator Six wire transferred $69,620 from his account with Deutsche Bank Trust Co. to the arms manufacturer's account in Virginia.

ss.  In or about August 2004, Co-conspirator Four sent by Federal Express to Defendant **STEIN** a portion of the stolen currency that she had smuggled into the United States from Iraq.

tt.  On or about August 24, 2004, Co-conspirator Four sent the following e-mail, which reads in relevant part:

> **From:** [Co-conspirator Four]
> **To:** [Co-Conspirator Six]
> **Cc:** [Defendant **STEIN**]; [Person F]
> **Sent:** Thursday, August 26, 2004 3:31 PM
> **Subject:** car for [Co-conspirator Four]
>
> [Co-Conspirator Six]
>
> I just got a call from the comptroller at the dealership. The final payment has been transferred. I have to pay $3,111.50 for tax and title. The dealership has informed me that the car is available for my pick up.
>
> As an FYI [Person F] has been calling me on a regular basis and has emailed and spoken directly

24

to the dealership comptroller. I know there was a
problem with the wire transfer from the bank in
Cyprus.

I'll let you know when I actually pick up the car.
At that point you'll get a great big thank you and
I owe you from me. [].

[Co-conspirator Four]

uu.  On or about September 2, 2004, Co-conspirator Four sent

the following e-mail:

**From:** [Co-conspirator Four]
**To:** [Co-Conspirator Six]
**Sent:** Thursday, September 02, 2004 1:55 PM
**Subject:** Re: update

[Co-conspirator Six]

The truck is Great!!! I needed a new truck. My old
truck is a 1991 with well over 150,000 miles on it.
People I work with cannot stop commenting on how much
they love it. It drives real smooth like a sedan.
As you know, Bob and I stay in touch. He told me the
way these State Dept guys are jerking you around. I
think (as does Bob and my team mate [Person K]) that
they're going to close CPA SC soon. In my opinion it
won't be soon enough. So these guys have nothing to do
and there's no future in where they're working anyway.
I have a very good friend who served with me in Bosnia.
He is working for the State Dept. He said there is a
huge number of vacancies for Baghdad and Kuwait. The
State Dept can't get anyone to serve there. That means
they'll have to start closing these places. They can't
keep them staffed. So don't worry about the State Dept
jerks. If there were any smoking guns, they would have
been found months ago.

Take care of yourself and make sure you stay safe over
there. Nothing in Iraq is worth dying for.

[Coconspirator Four]

25

vv.  On or about September 3, 2004, Coconspirator Four sent an e-mail which reads in relevant part:

> **Subject: email test**
> **From:** [Co-conspirator Four]
> **Date:** Fri, 3 Sep 2004 19:47:58  0700 (PDT)
> **To:** [Defendant **STEIN**]
>
> OK  Bob
>
> Did you get this message?  I'll send you what you need, but we need to talk.  Can I count on [Co-conspirator Six] for payback? I have nothing other than what I carried out.  I have no investments like you do and I get paid badly where I work.  You know I'm your friend and I will always stand by you, but I need to know how much I'll end up with in the end.
>
>            *   *   *
> [Co-conspirator Four]

ww. In or about October 2004, Coconspirator Four sent by Federal Express to Defendant **STEIN** a portion of the stolen currency that she had smuggled into the United States from Iraq.

xx. In or about December 2004, Coconspirator Four sent by Federal Express to Defendant **STEIN** a portion of the stolen currency that she had smuggled into the United States from Iraq.

yy. On or about the following dates, Co-Conspirator Six caused the following wire transfers of funds to be sent to Defendant **STEIN** or his spouse or others acting on **STEIN**'s behalf, or to **STEIN**'s coconspirators or their spouses or others acting on their behalf, from foreign bank accounts Co-Conspirator Six controlled:

| Date | Amount | Description |
|------|--------|-------------|
| 1/15/04 | $30,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 1/27/04 | $6,500 | Transfer for benefit of **STEIN** (for the purchase of jewelry, from a jeweler in North Carolina) |
| 1/29/04 | $70,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 2/9/04 | $50,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 2/9/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 2/17/04 | $50,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 3/2/04 | $50,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 3/3/04 | $15,000 | Transfer for benefit of **STEIN** (for the purchase of jewelry) |
| 3/15/04 | $15,000 | Transfer for benefit of **STEIN** (for the purchase of jewelry) |
| 3/15/04 | $50,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 3/29/04 | $140,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 3/29/04 | $100,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 4/7/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Romania to a bank in California) |
| 4/26/2004 | $9,475 | Transfer for benefit of **STEIN** (for the purchase of an automobile) |
| 4/27/04 | $1,973 | Transfer for benefit of **STEIN** (for the purchase of an automobile) |
| 4/28/04 | $60,017 | Transfer for benefit of **STEIN** (for the purchase of an automobile) |

| 5/3/04 | $40,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
|---|---|---|
| 5/3/04 | $25,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 5/3/04 | $35,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 5/5/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 6/2/04 | $35,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 6/3/04 | $5,523 | Transfer for benefit of Co-conspirator Two (for the purchase of an automobile) |
| 6/4/04 | $44,261 | Transfer for benefit of Co-conspirator Two (for the purchase of an automobile) |
| 7/6/04 | $20,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 7/6/04 | $25,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 7/6/04 | $75,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 7/6/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 7/20/04 | $14,968 | Transfer for benefit of **STEIN** (for the purchase of a recreational vehicle) |
| 8/10/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/19/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |

| 8/25/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to an automobile dealer in New Jersey). |
| 9/13/04 | $124,962 | Transfer for benefit of **STEIN** (for the purchase of a recreational vehicle) |
| 9/27/04 | $30,000 | Transfer for benefit of **STEIN** (from a bank in Switzerland to a bank in North Carolina) |
| 9/30/04 | $8,472 | Transfer for benefit of **STEIN** (for the purchase of a recreational vehicle) |
| 10/20/04 | $33,000 | Transfer for benefit of **STEIN** (from a bank in Switzerland to a bank in North Carolina) |

zz.   In order to promote the ongoing fraud conspiracy alleged in Count 1 of the Information and to conceal the source, nature, origin, ownership and control of the proceeds of specified unlawful activity, Defendant **STEIN** and others caused wire transfers or other financial transactions to be sent to bank accounts that Defendant **STEIN** and others known or controlled from foreign bank accounts owned or controlled by Co-Conspirator Six, including all of the transactions delineated in paragraph yy above.

aaa.   Defendant **STEIN** and others engaged in monetary transactions in criminally derived property of a value greater than $10,000, by through or to a financial institution, with such property being derived from the specified unlawful activities in the Information, including but not limited to the following transactions in the approximate amounts and dates listed below:

| Date | Amount | Description |
|---|---|---|
| 1/22/04 | $19,500 | Payment to a law firm for the benefit of Defendant **STEIN**. |
| 2/9/04 | $34,791 | Payment to a North Carolina automobile dealer for the benefit of Defendant **STEIN**. |
| 2/13/04 | $40,000 | Interbank transfer for the benefit of Co-conspirator Two. |
| 3/3/04 | $15,000 | Payment to a North Carolina jewelry company for the benefit of Defendant **STEIN**. |
| 3/15/04 | $15,000 | Payment to a North Carolina jewelry company for the benefit of Defendant **STEIN**. |
| 4/21/04 | $19,311 | Payment to a home improvements company for the benefit of Defendant **STEIN**. |
| 4/28/04 | $60,017 | Payment to a car dealer for the benefit of Defendant **STEIN**. |
| 6/2/04 | $22,024 | Payment to a motorcycle dealer for the benefit of Co-conspirator Two. |
| 8/2/04 | $107,000 | Interbank transfer for the benefit of Co-conspirator Two. |
| 8/3/04 | $80,000 | Transfer to investment account for the benefit of Co-conspirator Two. |
| 9/16/04 | $10,527 | Payment to a cabinet company for the benefit of Co-conspirator Four. |
| 10/8/04 | $30,971 | Payment to a North Carolina auto dealer for benefit of Defendant STEIN. |
| 11/11/04 | $11,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 4/8/05 | $20,000 | Transfer from investment account for the benefit of Co-conspirator Two. |

bbb.  Defendant **STEIN**, Co-conspirator Four and others structured payments to home improvements companies, car dealerships and others in an attempt to avoid scrutiny by the

30

Internal Revenue Service and others, to evade the reporting requirements of federal law, and in attempt to evade the threshold of 18 U.S.C. § 1957.  Transactions which Defendant **STEIN** and his co-conspirators caused or attempted to cause for such purposes include the following in the approximate amounts and dates listed below:

| Date | Amount | Description |
|---|---|---|
| 8/10/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/19/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/25/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 10/5/04 | $9,655 | Payment to home improvements company for the benefit of Defendant **STEIN**. |
| 10/7/04 | $9,655 | Payment to home improvements company for the benefit of Defendant **STEIN**. |
| 10/11/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 11/12/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 11/24/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 12/15/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |

ccc. On or about November 13, 2005, in Hope Mills, North Carolina, Defendant **STEIN**, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed at least 50 firearms including four M203 grenade launchers, 29 automatic machine guns, 10 .45 caliber pistols, 2 .45 caliber silencers, as well as 95 (30) round machine gun magazines, and other related weaponry which were obtained in and affecting commerce.

ddd. On or about November 13, 2005, in Hope Mills, North Carolina, and elsewhere Defendant **STEIN**, did knowingly possess and transfer, and willfully aid, abet and cause to be possessed and transferred, machine guns to his co-conspirators and others including, a HK53A3 Submachine Gun, Serial Number 76-116138, and a HK SA58 Rifle .308 Machine Gun Serial Number DS 23753.

eee. On or about November 13, 2006, Defendant **STEIN** had approximately $100,000 in cash in his home that he stole from the CPA.

fff. In carrying out the crimes charged in the Information, Defendant **STEIN** obtained property, including but not limited to the following property:

    1. an interest in one Porsche automobile, VIN WP0AB29953S696097, valued at approximately $160,000;

    2. one Coach House RV, model 272XL, VIN 1FDXE45S64HBO856, valued at approximately $170,000;

3. a 2004 Toyota Sienna VIN 5TDZA22CX4S120818, valued at approximately $16,320;

4. a 2004 Chevrolet Colorado Truck 1GCDT136048222172, valued at approximately $13,730;

5. a 2004 Lexus LS 430 VIN JTHBN36F840153933, valued at approximately $55,460;

6. Two plots of real property located at 5610 Spreading Branch Road, Hope Mills, NC 28348, the legal descriptions for which are identified as:

> • Lot 3 Fox Meadow, Sec 1, Plat Book 108, Page 37 CCR, Cumberland County, NC

> • Lot 21 Block B Rockfish Mebane, Cumberland County, NC;

7. approximately $164,900 deposited into Bragg Mutual Federal Credit Union account 3366588;

8. approximately $92,885.00 initially deposited into Bragg Mutual Federal Credit Union account 42825890;

9. approximately $210,000 initially deposited into First Citizens Bank account 000348807327;

10. various computers, including the following:

> • Dell Tower Dimension 8100
> • Sony Personal Computer
> • Toshiba Protege Personal Computer
> • Toshiba Satellite Computer

11. US Currency in the amount of $100,000.00

12. 2002 Eagle Silver Dollars;

13. Breitling watches with the following serial numbers 437469, 437848, 780889, and 3631224, and Breitling watches with the following identifying numbers;

> • Breitling Watch A71365

> • Breitling Watch B72345

33

- Breitling Watch A72345

- Breitling Watch L21330

- Breitling Watch A24322

- Breitling Watch A12023

- Breitling Watch E13360

- Breitling Watch A39363

- Breitling Watch A39362

- Breitling Watch D13022

- Breitling Watch A25362

- Breitling Watch D22322

- Breitling Watch A42362

- Breitling Watch E56321

14. a 6 ct. round diamond ring;

15. a 1.66 ct. sapphire ring;

16. a 1.12 ct. diamond ring;

17. a diamond and platinum ring;

18. three diamond rings;

19. a men's Avenger Chronometer;

20. a 2.54 ct. sapphire necklace;

21. two sets of diamond earrings;

22. a set of hoop earrings;

23. a diamond necklace;

24. a pearl necklace;

25. a set of pearl and diamond earrings;

34

26. a diamond tennis bracelet;

27. commemorative coins and currency;

28. Various firearms:

- four grenade launchers;

- twenty fully automatic submachine guns;

- twelve .308 caliber machine guns;

- twelve .45 caliber pistols; and

- four .45 caliber silencers;

29. A 1965 Cessna T210F airplane Serial Number T210-0004; and

30. at least $340,000 in cash.

DATED: ~~De~~ Jan 2ø , 2006, at Washington, DC.


FOR THE Defendant

ROBERT J. STEIN, Jr.
Defendant




Carlos Vanegas, Esq.
Assistant Federal Public
    Defender
Federal Public Defender
for the District of Columbia
625 Indiana Ave. NW,
Suite 550
Washington, DC. 20004
(202)208-7500
Washington, DC 20530

FOR THE UNITED STATES


Richard Weber, Chief
Chief
Asset Forfeiture and Money
Laundering Section

Noel L. Hillman, Chief
Public Integrity Section

Paul Pelletier, Chief
Fraud Section


By:

Mark J. Yost, Trial Attorney
Patrick Murphy, Trial Attorney
Asset Forfeiture and Money
Laundering Section

By:

James A. Crowell IV, Trial Attorney
Ann C. Brickley, Trial Attorney
Public Integrity Section

United States Department of Justice
Criminal Division
1400 New York Ave., NW
Washington, DC 20005
Mark.Yost@usdoj.gov
Patrick.Murphy@usdoj.gov
James.Crowell@usdoj.gov
Ann.Brickley@usdoj.gov


36